FILED

2011 May-11  AM 10:42
U.S. DISTRICT COURT
N.D. OF ALABAMA



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| *ex rel.* JOHN GERMANOS and | ) | |
| SHERICE BETTON | ) | Case No: |
| | ) | |
| Plaintiff, | ) | **FILED UNDER SEAL** |
| | ) | |
| v. | ) | **DO NOT PLACE IN PRESS BOX** |
| | ) | **DO NOT ENTER ON PACER** |
| SOUTHEAST HOSPICE NETWORK, | ) | |
| INC. | ) | **DEMAND FOR JURY** |
| | ) | |
| Defendant. | ) | |

## *QUI TAM* COMPLAINT

Plaintiff-Relators John Germanos and Sherice Betton, on behalf of themselves and the United States of America, allege and claim against Southeast Hospice Network, Inc., as follows:

### JURISDICTION AND VENUE

1.      This action arises under the False Claims Act, 31 U.S.C. §§ 3729-33 (the "False Claims Act").   Accordingly, this Court has jurisdiction pursuant to 28 U.S.C. § 1331.   Jurisdiction is also authorized under 31 U.S.C. § 3732(a).

Venue lies in this judicial district pursuant to 31 U.S.C. § 3732(a), because Defendant qualifies to do business in the State of Alabama, transacts substantial

business in the State of Alabama, transacts substantial business in this judicial district, and can be found here. Additionally, and as described herein, Defendant committed within this judicial district, acts proscribed by 31 U.S.C. § 3729. Specifically, and *inter alia*, Defendant submitted and caused to be submitted within this judicial district false claims for hospice care for ineligible patients and false claims for palliative care which should have been paid for by Defendant, and made or used false records material to such claims.

## PARTIES

2.      Defendant Southeast Hospice Network, Inc. ("Southeast Hospice") is a Medicare-certified hospice provider offering hospice services in several Alabama counties from its locations in Pelham, Montgomery, Jasper and Albertville, Alabama. Southeast Hospice is operated by Debbie Wilson ("Wilson"), Executive Director, and Lynne Davenport ("Davenport"), Administrator.   James F. Mracek, II, M.D. is the Southeast Hospice Medical Director.

3.      Plaintiff-Relator Sherice Betton is a registered nurse of 4 years' experience.   Ms. Betton was employed by Southeast Hospice as a Case Manager in or around March, 2010.   In the course of her duties as a clinical nurse at Southeast Hospice, Plaintiff-Relator Betton learned that Defendant conducts its hospice operations with the fraudulent intent to defraud the United States by billing for ineligible hospice patients and by avoiding the cost of palliative care for

legitimate hospice patients.  Ms. Betton was terminated by Southeast Hospice in January, 2011 upon the pretext that she had not returned a phone call to Administrator Davenport.

4.      Plaintiff-Relator John Germanos was employed by Southeast Hospice in July, 2010 as a marketing representative.  Mr. Germanos quickly discovered that Southeast Hospice required completely unrealistic and unreasonable admissions quotas from its marketing personnel.  As a result, Mr. Germanos felt constant pressure to admit non-qualifying patients to Southeast Hospice's rolls.   In February of 2011, Mr. Germanos was terminated for alleged failure to meet the unreasonable requirements established by Davenport and Wilson.

5.      Through their experiences, Plaintiff-Relators have witnessed so many instances of fraud as to believe that Defendant's fraudulent tactics are widespread, systematic practices endemic to Defendant.   Defendant's fraudulent conduct offends Plaintiff-Relators' long-standing dedication to the mission of hospice care and to the needs of terminally-ill patients and causes them to file this Complaint on behalf of themselves and the United States as relators under the *qui tam* provisions of the False Claims Act.

6.      Prior to filing this Complaint, Plaintiff-Relators voluntarily disclosed to the Government the information upon which this action is based.  To the extent that any public disclosure has taken place as defined by 31 U.S.C. §3739(e)(4)(A),

Plaintiff-Relators are the original source of the information for purposes of that Section.   Alternatively, Plaintiff-Relators have knowledge that is independent of and materially adds to any purported publicly disclosed allegations or transactions, and Plaintiff-Relators voluntarily provided that information to the Government before filing this Complaint. Plaintiff-Relators are serving contemporaneously herewith a statement of the material evidence in their possession upon which their claims are based.

## THE MEDICARE HOSPICE BENEFIT

### I.    Background

7.    Through the Medicare Program ("Medicare"), Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, et seq., the United States provides health insurance coverage for eligible citizens. Medicare is overseen by the United States Department of Health and Human Services through its Center for Medicare and Medicaid Services ("CMS").

8.    Through the Medicare Hospice Benefit (Hospice), Medicare pays for hospice care for certain terminally-ill patients who elect to receive such care.   *See* 42 U.S.C. § 1395d.   A patient is deemed to be terminally ill if the patient "has a medical prognosis such that his or her life expectancy is 6 months or less if the disease runs its normal course."   42 C.F.R. § 418.3.   In electing hospice care, a patient must agree to forego Medicare coverage for curative treatment.   *See* 42

U.S.C. § 1395d.   A patient may at anytime revoke his or her hospice election and resume Medicare Part A coverage.   42 C.F.R. § 418.28.

9.     Defendant's aggressive, profit-maximizing business model represents an intrusion of greed into an institution founded upon philosophical, spiritual, and medical notions of charity and care-giving.   The impetus for the modern hospice movement in the United States is attributed to psychiatrist Dr. Elizabeth Kübler Ross, whose 1969 *On Death and Dying* is acknowledged to have altered modern perceptions about care for the terminally-ill.   In the 1970s, U.S. hospices opened their doors as volunteer organizations dedicated to bringing comfort and humanity to terminal patients.     Testifying in 1975 before the U.S. Senate Special Sub-committee on Aging, Kübler Ross stated: "We should not institutionalize people. We can give families more help with home care and visiting nurses, giving the families and the patients the spiritual, emotional, and financial help in order to facilitate the final care at home."   In 1982, Congress created a provisional Medicare Hospice Benefit, made permanent in 1986 ("Hospice").   By 1990, 800 hospice companies were caring for 76,491 patients, with an average length of stay of 48.4 days.

10.     From such humble, altruistic roots, Hospice has become big business. Medicare Hospice payments rose from $205 million in 1989 to $9.2 billion in 2006.     In the 1998 article "Hospice Boom Is Giving Rise to New Fraud," the

*New York Times* recognized that the hospice infrastructure "was never designed to handle the expanding network of nursing homes, hospices, assisted-care centers and other services popping up to serve the nation's growing aging population." Venture capitalists and other investors have been quick to perceive that Hospice represents a potentially unlimited stream of income for those who bring aggressive marketing, sales, and growth tactics into the new industry of care for the dying.

11.    Leslie Norwalk, then Acting Director of the Centers for Medicare & Medicaid Services, testified before the U.S. House of Representatives Committee on Ways and Means in 2007 that "Hospice is not intended to be used as a nursing home."   Nevertheless, Defendant and other for-profit Hospice companies have instituted a fraudulent scheme to treat the Medicare Hospice Benefit as an improper subsidy for general nursing home and in-home care and to capitalize on and aggressively market to the nation's rapidly growing elderly population.

## II.    Hospice Benefits, Reimbursements, and Requirements

12.    Hospice covers a broad set of palliative services for qualified beneficiaries who have a life expectancy of six months or less as determined by their physician.   *See* 42 C.F.R. § 418.22.   Hospice is designed to provide pain-relief, comfort, and emotional and spiritual support to patients with a terminal diagnosis.   Qualified hospice patients may receive skilled nursing services, medication for pain and symptom control, physical and occupational therapy,

counseling, home health aide and homemaker services, short-term inpatient care, inpatient respite care, and other services for the palliation and management of the terminal illness.   *See* 42 C.F.R. § 418.202.

13.    Through Medicare and/or Medicaid (indirectly through the States), the United States reimburses hospice providers for services to qualified beneficiaries on a *per diem* rate for each day a qualified beneficiary is enrolled.   42 C.F.R. § 418.302.   Medicare or Medicaid makes a daily payment, regardless of the amount of services provided on a given day and even on days when no services are provided.   Payments are made according to a fee schedule with four base payment amounts for the four different categories of care: routine home care (RHC), continuous home care (CHC), in-patient respite care (IRC), and general in-patient care (GIC).

14.    In return for the Hospice *per diem* payment, hospices are obligated to provide patients with all covered palliative services.   *See* 42 C.F.R. § 418.202. The hospice must design a plan of care inclusive of all covered services necessary to meet the patient's needs.   *See* 42 C.F.R. § 418.56.   Among other services, every hospice must provide short-term inpatient care for pain-control and symptom-management related to the patient's terminal illness.   *Id.*; *see also* 42 C.F.R. § 418.108.

15.    Medicare will not pay for hospice services provided to patients who are not terminally-ill.  *See* 42 U.S.C. §1395y.    Furthermore, it is a universal requirement of the Medicare program that all services provided must be reasonable and medically necessary. *See* 42 U.S.C. §1395y(a)(1)(A); 42 U.S.C. § 1396, *et seq.*; 42 C.F.R. § 410.50.  Medicare providers may not bill the United States for medically unnecessary services or procedures performed solely for the profit of the provider. *Id.*

16.    Federal law authorizes Medicare administrative contractors ("MACs") and fiscal intermediaries ("FIs") to issue determinations as to the extent of Medicare coverage for particular items or services.  *See* 42 U.S.C. 1395ff. Accordingly, Medicare Hospice MACs and FIs publish local coverage determinations ("LCDs") establishing requirements for and limitations on Hospice coverage.  Medicare will not pay for hospice care provided to a patient who does not meet LCDs.  *See* 42 U.S.C. 1395y.

17.    To enroll as a Medicare provider, Defendant was required to submit a Medicare Enrollment Application for Institutional Providers.  *See* CMS Form 855A.  In submitting Form 855A, Defendant made the following "Certification Statement" to CMS:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand

> that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal Anti-Kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.

Form CMS-855A.

18.   Defendant then billed Medicare by submitting a claim form (CMS Form 1450) to the FI responsible for administering Medicare hospice claims on behalf of the United States. *See* CMS Form 1450.   Each time it submitted a claim to the United States through the FI, Defendant certified that the claim was true, correct, and complete, and complied with all Medicare laws and regulations.

19.   Defendant thus certified that each claim for a hospice *per diem* payment represented a day of care provided to a terminally-ill patient, and CMS expressly conditioned its payment on the truth and accuracy of that certification. Defendant further certified that its programs were in compliance with Medicare regulations, including the requirement that Defendant provide short-term in patient care related to its patients' terminal conditions.

## DEFENDANT'S FRAUDULENT SCHEMES

### I.    Billing for Ineligible Hospice Patients

20.   Defendant systematically defrauds Medicare and Medicaid by recruiting and cycling non-qualifying patients through its Hospice program.

21.   Defendant actively recruits, certifies, and bills the United States through CMS for ineligible patients.   Southeast Hospice Administrator Davenport sees to it that nearly every patient referred to Defendant is admitted, regardless of eligibility.   No patient may be declined admission to Southeast Hospice without Davenport's express permission.

22.   Southeast Hospice perpetrates and conceals its fraud through the creation of false records.   As described in the specific patient examples below, Davenport instructs Southeast Hospice employees to "chart negative" – that is, to falsify assessments and nursing notes to create the fraudulent appearance that the patients are terminal and are in decline when in fact they are not.

23.   The result of Defendant's practices is that many of its patients do not qualify for hospice care and are falsely billed to the United States. The following are merely representative examples of non-qualifying patients whose care has been falsely billed to the United States; Plaintiff-Relators estimate that at least half of Southeast Hospice's patients do not qualify for the Hospice benefit.   These patients' conditions belie a terminal diagnosis and do not comport with LCDs, yet they have been fraudulently certified by Defendant as terminally-ill and falsely billed to the United States through CMS:

(a)   E.M. was admitted on November 20, 2009 under an initial diagnosis of COPD.   In mid-2010 E.M.'s diagnosis was

changed to Multiple Debility.   From E.M.'s admission she was alert and oriented to person, place, and time.   E.M. ambulated independently, with no need of a wheelchair or walker, and in fact took her dog on a daily walk of approximately 3-4 miles.   Although she required only minimal assistance with ADL's, Davenport ordered Southeast Hospice nurses to falsely document that E.M. was "dependent" with respect to meal preparation, bathing, dressing, and ambulating to bathroom.   In fact, there was no hospice aide assigned to E.M. and she did not need one.   E.M. was discharged for "failure to decline" on January 14, 2011.   She never met Hospice criteria.

(b)    In contravention of her physician's recommendation for nursing home placement, S.D. was admitted on about October 28, 2008 under a diagnosis of COPD.   S.D. did not meet criteria or LCDs for COPD; S.D. did not use continuous oxygen and in fact, removed her oxygen to walk to her back porch and smoke cigarettes.   She was revoked in January, 2011 for failure to decline. S.D. never met the criteria for hospice care.

(c)    O.C. was admitted on November 20, 2009 for Congestive Heart Failure (CHF).   She did not use oxygen continuously.   O.C. visited her sister in the nursing home three times a week and

scheduled her Southeast Hospice visits around those excursions. O.C. could feed, bathe, and dress herself. She ambulated occasionally with walker and used a powered wheelchair for long distances. On an occasion when O.C. visited her primary physician, the physician stated that O.C.'s CHF was chronic but well-managed. O. C. was discharged for failure to decline on January 14, 2011. She never met criteria for hospice care.

(d)    W.S. was admitted on March 24, 2010, suffering from Alzheimer's disease. Although with some confusion, W.S. was able to feed himself, ambulate independently, and assist with bathing. W.S. was continent of bowel and bladder and stayed at home alone all day throughout the week. W.S. was revoked from hospice for admission to a geriatric psychiatric unit on October 28, 2010, then to nursing home.

(e)    W.N.M. was originally admitted on April 23, 2010 under a diagnosis of CHF. W.N.M. did not meet hospice criteria or LCDs for CHF. W.N.M never wore oxygen and was alert and oriented to person, place, and time. She was revoked and sent to a skilled nursing facility for 21-day rehabilitation on October 11, 2010. After her skilled nursing stay Plaintiff-Relator Betton was sent to re-evaluate

her for Hospice and refused to readmit him due to his non-qualification.

(f)    L.J. was originally admitted on January 15, 2010 with a diagnosis of Debility.   L.J. ambulated independently, was able to feed herself, and had a healthy appetite.   L.J. was continent of bowel with occasional bladder accidents. L.J. took no medication and had taken none for some years according to her caregiver.   After being improperly "revocated" and readmitted as described below, L.J. was eventually revoked on January 5, 2011 for admission to hospital, then nursing home placement.   She was not terminal and did not qualify for Hospice.

(g)    A.T was originally admitted on October 26, 2009 under a General Debility diagnosis.   A.T. ambulated independently with no walker and was able to feed herself.   A hospice aide visited A.T. twice a week to assist with baths. Plaintiff-Relator Betton frequently complained of A.T.'s inappropriateness at interdisciplinary team meetings, with no results.   A.T. was "revocated" for major surgery and then readmitted March 18, 2010.   To evade detection and expense, Davenport instructed Plaintiff-Relator Betton to discharge

A.T. prior to the newly-required Nurse Practitioner's visit, on January 12, 2011.

(h)     V.H. was originally admitted on October 28, 2009 suffering from Hypertensive Heart Disease.    Plaintiff-Relator Germanos overheard Southeast Hospice Administrator Davenport telling Registered Nurse Randy Glascock to discharge V.H. prior to a Nurse Practitioner's visit if he thought patient would not be re-certified.    Plaintiff-Relator Betton commented at several interdisciplinary group meetings that V.H. was not Hospice appropriate. V.H. exhibited no signs or symptoms of Hypertensive Heart Disease. V.H.'s blood pressure was managed well with medication, consistently in the 100s systolically and low 60s-70s diastolically.    V.H. denied shortness of breath and never wore oxygen. V.H. ambulated, daily climbing stairs. V.H. was discharged for failure to decline on January 5, 2011.

(i)     G.Y. was originally admitted on May 25, 2010 under a diagnosis of General Debility.   Plaintiff-Relator Betton was sent out to admit G.Y. under Dementia diagnosis.   After assessing patient, Plaintiff-Relator determined the patient was not appropriate for Hospice.   Davenport simply sent out another nurse and with orders to

admit patient under General Debility diagnosis.   G.Y. was able to ambulate independently without a walker and to care for herself and her disabled spouse.   G.Y. did not qualify for hospice care.

(j)   E.M. was admitted under the diagnosis of Alzheimer's disease.   She is currently entering her 17th re-certification period. E.M. is able to feed herself and ambulate with walker.   E.M. is stable and not in decline. She does not meet Hospice qualifications.

(k)   H.R. was admitted under the diagnosis of Alzheimer's disease.   He was revocated on July 9, 2010 (which was back-dated) for a three day hospitalization then to the nursing home for rehabilitation. H.R. was readmitted on August 6, 2010. H.R. was ambulatory with walker and able to feed himself.   He responds appropriately to questions and able to communicate effectively. H.R. does not qualify for hospice care.

## II.   Billing for Hospice *Per Diem* Payments Without Legitimate Patient Assessments or Plans of Care

24.   Defendant further effects its fraud through evasion of Medicare requirements and disregard for patient care standards.   Rather than assessing the needs of each individual patient and designing a care plan to meet those needs as Medicare regulations require, Southeast Hospice cuts costs at the expense of

patient care by admitting patients without proper assessments and operating under a standard, non-specific "plan of care, " in violation of 42 C.F.R. § 418.56.

25.   Plaintiff-Relator Germanos was in a meeting early in his employment and overheard Administrator Davenport explain to the Medical Director that Davenport only needed the admission and assessment paperwork as a record "that a face had seen the patient."   In fact, Southeast Hospice completely disregards nurses' assessments and every patient's care plan is essentially the same; each patient gets the same nurse visit and nursing aide visits per week.   Without consideration of a patient's care needs and in complete disregard of the palliative-care requirements of the patient, Davenport simply admits and revokes patient candidates based on the economic desires of the Defendant.   *See* 42 C.F.R. § 418.54.

### III.   Eliciting and Backdating Fraudulent Revocations for Legitimate Hospice Patients who Require Hospitalization for Palliative Care

26.   Defendant fraudulently increases its profits and shifts costs to the United States through a pattern and practice of fraudulently "revocating" legitimate Hospice patients who require expensive palliative hospital care and "backdating" paperwork to evade responsibility for costly procedures. Defendant effectuates its scheme through the back-dating of revocation forms.   When the patient is admitted to the hospital for expensive treatment, Defendant falsely back-dates the

form and files it, as though the patient has made a prior revocation of the hospice benefit.

27.     Hospice requires that Defendant bear any costs for palliative care that exceed the standard per-diem amount. *See* 42 C.F.R. §§ 418.56; 418.108; 418.202. The *per-diem* rate paid by the United States to Defendant, however, is generally much less than the actual per-diem cost of even a routine hospital stay for palliative treatment. Unwilling to absorb such high costs of hospital care, Defendant fraudulently shifts these costs to the United States through false revocations. In order to boost its profit margin, Defendant creates the false appearance of a hospice revocation by backdating and filing the revocation form.

28.     When patients are hospitalized without notice to Defendant and undergo expensive procedures before Defendant can fraudulently "revocate" the patient, Defendant simply "backdates" the revocation form so that the revocation appears to have taken place prior to the hospital stay. The cost of care which should be borne by Defendant is then borne by the United States through Medicare Part A or Medicaid; as a result of the scheme, the United States pays a full Medicare fee-per-service rate for care that it has already paid for at the lower Hospice per-diem rate.

29.    The following are examples of patients who were fraudulently "revocated" by Defendant to avoid the cost of palliative care, whose revocation forms were falsely backdated, or both:

(a)    Patient F.H. was admitted to Southeast Hospice with terminal colorectal cancer.  He was repeatedly hospitalized for pain management – treatment that is plainly related to his terminal diagnosis and fits the definition of palliative care.  Yet, F.H. was "revocated" on each occasion so Southeast Hospice could avoid the cost of his hospitalization.  As a result, the United States paid a much increased rate for F.H.'s pain management through Tricare.

(b) Patient E.M., described above, was hospitalized on July 9, 2010.  Southeast Hospice did not learn of her hospitalization for several days.  Upon discovering it, Davenport ordered Plaintiff-Relator Betton to obtain the patient's signature on a revocation form and to backdate the form to July 9 to avoid the cost of the hospital stay.

(c)    Patient S.D., described above, was hospitalized several times for PEG tube replacement while on Southeast Hospice's rolls. The procedure was palliative and related to S.D.'s COPD diagnosis. Nonetheless, S.D. was revoked from hospice each time she was

hospitalized.    On each occasion, Davenport ordered that the revocation form be back-dated.

(d)    Patient L.J. was revocated on July 28, 2010 for a hospital visit and readmitted on August 5, 2010. Plaintiff-Relator Betton was out sick the week of patient's admission to the hospital.   Upon her return, Davenport ordered Ms. Betton to obtain a revocation from L.J. back-dated to a date prior to L.J.'s hospital admission.

30.    By and through all of the circumstances described, *supra*, Defendant has violated the healthcare laws and regulations of the United States, undermined the noble intention and mission of Hospice, defrauded the United States of America, and jeopardized the already strained Medicare program.

## COUNT ONE
## PRESENTING OR CAUSING TO BE PRESENTED FALSE CLAIMS
## UNDER 31 U.S.C. § 3729

31.    Plaintiff-Relators adopt and incorporate the previous paragraphs as though fully set forth herein.

32.    By and through the fraudulent schemes described herein, Defendant knowingly – by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information –   presented or caused to be presented false or fraudulent claims to the United States for payment or approval, to wit:

(a)   Defendant submitted false claims for Hospice care provided to patients whom Defendant knew did not meet Medicare or Medicaid requirements for Hospice, in violation of 42 U.S.C. §1395y;

(b)   Defendant submitted false claims for Hospice care provided to patients who were not properly assessed by an RN and in the absence of a legitimate care plan as required by 42 C.F.R. §§ 418.201; 418.56.

(c)   Through fraudulent revocations, Defendant caused hospitals and other healthcare providers to submit false claims under Medicare Part A or Medicaid for care that should have been paid for by Defendant by reason of its obligations as Medicare hospice providers under 42 C.F.R. §§ 418.201, *inter alia*.

(d)   Defendant submitted false claims for Hospice services premised upon Defendant's fraudulent certifications of compliance with Medicare regulations as made on CMS Forms 885A and 1450 and elsewhere;

33.   The United States paid the false claims described herein and summarized in paragraph 32(a)-(d).

34.   Defendant's fraudulent actions, as described *supra*, are part of a widespread, systematic pattern and practice of knowingly submitting or causing to

be submitted false claims to the United States through fraudulent certification and re-certification of Hospice patients and fraudulent billing of the United States through Medicare or Medicaid.

35.    Defendant's fraudulent actions described herein have resulted in damage to the United States equal to the amount paid or reimbursed by the United States through Medicare and Medicaid for such false or fraudulent claims.

WHEREFORE, Plaintiff-Relators demand judgment in their favor on behalf of the United States, and against Defendant, in an amount equal to treble the damages sustained by reason of Defendant's conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees and costs, and such other, different, or further relief to which Plaintiff-Relators may be entitled.

**COUNT TWO**
**MAKING OR USING FALSE STATEMENTS OR RECORDS MATERIAL**
**TO A FALSE CLAIM UNDER 31 U.S.C. § 3729**

36.    Plaintiff-Relators adopt and incorporate the previous paragraphs as though fully set forth herein.

37.    By and through the fraudulent schemes described herein, Defendant knowingly – by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information – made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim or to get a false or fraudulent claim paid or approved by the United States, to wit:

(a)    Defendant created and used false certifications of terminal illness; false patient care plans not calculated to cope with patients' actual needs and conditions; and other false records intended to support its fraudulent billing to the United States, all in violation of 42 U.S.C. § 1395y and the Medicare regulations cited *supra*.

(b)    Defendant made false certifications regarding past, present, or future compliance with a prerequisite for payment or reimbursement by the United States through Medicare or Medicaid, including false certifications on CMS Forms 885A and 1450 as described *supra*, when Defendant was aware that its practices as described herein were in violation of Medicare payment prerequisites, including but not limited to the 42 U.S.C. §1395y and the applicable LCDs.

(c)    Defendant made or used or caused to be made or used fraudulent revocation forms intended to create the false appearance that patients required and elected to receive aggressive curative treatment when in fact the patients never truly revoked their hospice election, the treatment required was palliative in nature and should have been paid for by Defendant pursuant to *See* 42 C.F.R. §§418.201; 418.56, *inter alia*, or both;

38.    The false records or statements described herein and summarized in paragraph 37(a)-(c) were material to the false claims submitted or caused to be submitted by Defendant to the United States.

39.    In reliance upon Defendant's false statements and records, the United States paid false claims that it would not have paid if not for those false statements and records.

40.    Defendant's fraudulent actions described herein have resulted in damage to the United States equal to the amount paid or reimbursed to Defendant and others by the United States for such false or fraudulent claims.

WHEREFORE, Plaintiff-Relators demand judgment in their favor on behalf of the United States, and against Defendant, in an amount equal to treble the damages sustained by reason of Defendant's conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees and costs, and such other, different, or further relief to which Plaintiff-Relators may be entitled.

## COUNT THREE
## "REVERSE FALSE CLAIMS" UNDER 31 U.S.C. § 3729(a)(1)(G)

41.    Plaintiff-Relators adopt and incorporate the previous paragraphs as though fully set forth herein.

42.    By and through the fraudulent schemes described herein, Defendant knowingly – by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information – made, used, or caused to be

made or used, a false record or statement material to an obligation to pay or transmit money or property to the United States, or knowingly concealed or knowingly and improperly avoided an obligation to pay or transmit money or property to the United States, to wit:

> (a)    Defendant knew that it had received millions of dollars in Hospice *per diem* payments for patients who did not qualify for Hospice, yet Defendant took no action to satisfy its obligations to the United States to repay or refund those payments and instead retained the funds and continued to bill the United States;

> (b)    Defendant knew that the United States had paid millions of dollars for palliative hospital in-patient treatment that should have been paid for by Defendant, yet Defendant took no action to satisfy its obligations to the United States to repay or refund those payments and instead retained the funds and continued to bill the United States;

43.    As a result of Defendant's fraudulent conduct, the United States has suffered damage in the amount of funds that belong to the United States but are improperly retained by Defendant.

WHEREFORE, Plaintiff-Relators demand judgment in their favor on behalf of the United States, and against Defendant, in an amount equal to treble the damages sustained by reason of Defendant's conduct, together with civil penalties

as permitted by 31 U.S.C. § 3729, attorneys' fees and costs, and such other, different, or further relief to which Plaintiff-Relators may be entitled.

## COUNT FOUR
## FRADULENT INDUCEMENT UNDER 31 U.S.C. § 3729

44.    Plaintiff-Relators adopt and incorporate the previous paragraphs as though fully set forth herein.

45.    By and through the actions described herein, Defendant knowingly presented, or caused to be presented, to the United States false or fraudulent claims, to wit:   Defendant fraudulently induced the United States to pay per-patient *per-diem* fees for patient care that Defendant never intended to provide.

46.    Through submission of CMS Form 855A and otherwise, Defendant agreed to provide care to patients in return for a per-patient *per-diem* payment from the United States through CMS.  By regulation, including 42 C.F.R. § 418.201, United States made it clear that such per-patient *per-diem* payments were consideration for Defendant's agreement to provide ongoing, complete palliative patient care; and Defendant's agreement to provide such ongoing, complete palliative care was – in fact – a condition of the United States' per-patient *per-diem* payments to Defendant.

47.    At the time that Defendant requested and accepted the per-patient *per-diem* payments, it intended to avoid the high costs of palliative-care procedures and medications by using false documents to create the appearance that patients

had temporarily revoked their Hospice election, in order that such expensive procedures should be billed under Medicare Part A.

48.     Accordingly, the United States was misled by Defendant's material misrepresentation that it would provide palliative care for such patients, which Defendant ultimately avoided through fraudulent revocation.  In many instances, after the expensive procedures were completed the patients were fraudulently re-certified for Hospice.

49. By and through the actions described *supra*, Defendant knowingly made, used, or caused to be made or used, false records or statements, including but not limited to fraudulent revocation documents and back-dated revocation records and false claims for payment to the United States related to the per-patient *per-diem* claims for payment. Such false records or statements were used by Defendant to get false or fraudulent claims paid or approved by the United States.

50.     Defendant's fraudulent actions described herein have resulted in damage to the United States equal to the payments made to Defendant and others by the United States through Medicare for all patients whose hospice election was fraudulently revoked.

WHEREFORE, Plaintiff-Relators request entry of judgment in their favor on behalf of the United States and against Defendant in an amount equal to treble the damages sustained by reason of Defendant's conduct, together with civil penalties

as permitted by 31 U.S.C. § 3729, attorneys' fees and costs, and such other, different, or further relief to which Plaintiff-Relators may be entitled.

## COUNT FIVE
## CONSPIRACY UNDER 31 U.S.C. § 3729(a)(3)

51.     Plaintiff-Relators adopt and incorporate the previous paragraphs as though fully set forth herein.

52.     Defendant knowingly presented, or caused to be presented, false or fraudulent claims to the United States for payment or approval, to-wit: Defendant knowingly certified and/or re-certified Hospice patients whom it knew did not qualify for Medicare or Medicaid reimbursement and presented or caused to be presented false claims to the United States through Medicare or Medicaid for payment of same.

53.     The United States paid Defendant for such false claims.

54.     Defendant, in concert with its principals, agents, employees, subsidiaries, and other institutions did agree to submit such false claims to the United States.

55.     Defendant and its principals, agents, and employees acted, by and through the conduct described *supra*, with the intent to defraud the United States by submitting false claims for payment to the United States through Medicare or Medicaid.

56.    Defendant's fraudulent actions, together with the fraudulent actions of its principals, agents and employees, have resulted in damage to the United States equal to the amount paid by the United States to Defendant and others as a result of Defendant's fraudulent claims.

WHEREFORE, Plaintiff-Relators demand judgment in their favor on behalf of the United States and against Defendant, in an amount equal to treble the damages sustained by reason of Defendant's conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees, costs, interest, and such other, different, or further relief to which Plaintiff-Relators may be entitled.

## COUNT SIX
## SUPPRESSION, FRAUD, AND DECEIT

57.    Plaintiff-Relators adopt and incorporate the previous paragraphs as though fully set forth herein.

58.    Defendant misrepresented or suppressed the material facts that (1) a substantial number of its patients enrolled in Hospice do not qualify for Hospice and are not terminally-ill and (2) Defendant created and submitted numerous false revocation forms for patients who never made a true revocation of their Hospice election and who in fact required only palliative care.

59.    Defendant was legally obligated to communicate these facts to the United States.

60.    Such misrepresentations and suppressions were made willfully to deceive or recklessly without knowledge.

61.    The United States acted on Defendant's material misrepresentations and suppressions described herein to its detriment.

62.    Defendant's fraudulent actions described herein have resulted in damage to the United States equal to the amount paid by the United States as a result of Defendant's fraudulent claims.

WHEREFORE, Plaintiff-Relators demand judgment in their favor on behalf of the United States and against Defendant pursuant to 31 U.S.C. § 3732 and Ala. Code §§ 6-5-101, 6-5-102, and 6-5-103 in an amount sufficient to compensate the United States for Defendant's fraud, suppression, and deceit, together with punitive damages in an amount calculated to deter Defendant from engaging in such conduct in the future, along with attorneys' fees, costs, interest, and any other further or different relief to which Plaintiff-Relators may be entitled.

Date: May _10th_, 2011.

_____
HENRY I FROHSIN
JAMES F. BARGER, JR.
J. ELLIOTT WALTHALL
RONALD R. BRUNSON

**Attorneys for Plaintiff-Relators**
**John Germanos and Sherice Betton**

**OF COUNSEL**
FROHSIN & BARGER, LLC
One Highland Place, Suite 310
2151 Highland Avenue
Birmingham, Alabama 35205
Tel:   205.933.4006
Fax:   205.933.4008
henry@frobar.com
jim@frobar.com
elliott@frobar.com
ron@frobar.com


## RELATORS DEMAND A TRIAL BY STRUCK JURY

## CERTIFICATE OF SERVICE

On this the __10th__ day of May, 2011, Plaintiff-Relators hereby certify that in

compliance with Federal Rule 4 of the Civil Rules of Procedure, service of the *Qui*

*Tam* Complaint has been executed as follows:


**By Hand-Delivery to:**

United States Attorneys Office
Attn:   Mr. Lloyd Peeples, AUSA
1801 Fourth Avenue North
Birmingham Alabama 35203


**By Certified Mail to:**

Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001


_____
OF COUNSEL